**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **ADAM WRIGHT,** | § | |
|    **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 1 :26-cv-01330** |
| **THE UNIVERSITY OF TEXAS/** | § | |
| **TEXAS A&M INVESTMENT** | § | |
| **MANAGEMENT COMPANY** | § | |
| **d/b/a UTIMCO,** | § | |
|    **Defendant.** | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

**I.**
**PARTIES**

ADAM WRIGHT, Plaintiff in the above-styled and numbered cause, files this Original Complaint against THE UNIVERSITY OF TEXAS/TEXAS A&M INVESTMENT MANAGEMENT COMPANY d/b/a UTIMCO (hereinafter, "Defendant" or "UTIMCO"), and in support thereof respectfully shows the Court and jury the following:

1.    Plaintiff Adam Matthew Wright ("Wright") is a Texas resident with an address of 1201 Dwyce Drive, Austin, TX 78757.

2.    Defendant The University of Texas/Texas A&M Investment Management Company ("UTIMCO") is a non-profit corporation duly organized under the laws of the State of Texas. UTIMCO has a principal business address of 210 West 7th Street, Suite 1700, Austin, Texas 78701. UTIMCO may be served with process in this lawsuit by and through its registered agent, C T Corporation System, 1999 Bryan St, Ste. 900, Dallas, TX 75201.

3. UTIMCO is, or was at all relevant times, an employer within the meaning of the FMLA, employing fifty or more employees for each working day during each of twenty or more calendar workweeks in the current or preceding calendar year. 29 U.S.C. § 2611(4)(A)(i).

**II.**
**JURISDICTION AND VENUE**

4. This action is brought pursuant to 28 U.S.C. § 1331 (federal question), as the matter in controversy concerns defendant's violation of 29 USCS §§ 2611 et seq. (CHAPTER 28. FAMILY AND MEDICAL LEAVE).

5. Venue is proper under 28 U.S.C. § 1391(b)(2), as this is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

**III.**
**BACKGROUND FACTS**

6. UTIMCO is a private nonprofit corporation headquartered in Austin, Texas, created in 1996 to professionally manage the investment assets of the University of Texas System and the Texas A&M University System.

7. Wright is an experienced accounting, consulting, and finance expert with approximately 20 years of experience. UTIMCO hired Wright in March 2019 as Associate Director of Operations and Accounting before later promoting him to Director in September 2021. In late 2021, Wright was selected as Chief of Staff to the CEO, effective January 1, 2022. This was an executive-level position, giving Wright a voice (if not a vote) in effectively every important meeting and strategic decision. Traditionally at UTIMCO, the Chief of Staff role is envisioned as a two-to-three-year rotational role, with a successful tenure resulting in transition to a senior position elsewhere within the Company. Wright

performed well as Chief of Staff, including navigating through a CEO transition. By way of illustration, CEO Rich Hall affirmed Wright's track record of success, viability as a succession candidate for COO, and potential for further executive leadership positions in a May 6, 2024 letter to a fellow fund CEO.

8. Wright also suffers from anxiety and depression, which he discussed openly with management at UTIMCO throughout his tenure and which he was largely able to successfully manage. However, beginning in February 2024, he began to experience unexplained friction from UTIMCO's General Counsel, Carolina De Onis. One such incident involved media requests. Typically, the Chief of Staff responds to standard media requests while the General Counsel handles open records requests. In late February, after De Onis inexplicably inserted herself into the media relations process multiple times, Wright politely but firmly reminded her that while he appreciated her concern, he had the process under control and did not think her involvement was necessary. The following Monday, De Onis confronted Wright and verbally attacked him, calling the email "hostile, aggressive, and threatening." When Wright asked her what in the email was threatening, she pointed to a line in the email where Wright indicated that her comment was unnecessary. When Wright correctly pointed out that this was not hostile, aggressive, or threatening, she responded that he should reach out to UTIMCO's independent executive consultant because his conduct was "inappropriate."

9. Wright discussed the interaction with both the independent executive consultant and another member of UTIMCO's Leadership Team who was aware of the email exchange, and both of them confirmed that Wright's email to De Onis was professional and appropriate. The executive consultant went on to say that De Onis has a tendency to pick

fights and opined that she had a "vendetta" against Wright. Further, the other Leadership Team member advised that De Onis had targeted him in a similar manner the prior year. Yet another senior member of the Leadership Team independently and separately notified Wright of the vendetta. Wright informed CEO Rich Hall and Chief Human Resources Officer Alison Rogers-McCoy that De Onis had attacked him and made wild accusations, that he had obtained independent verification about his messaging at her request, and that he was not sure what she was taking issue with. The response was, essentially, "well, she's the general counsel, don't make her mad."

10. Unfortunately, this was not easy to accomplish. Wright was the executive sponsor of UTIMCO's Pride Month activities for 2023 and 2024. As head of UTIMCO's DEI Council, De Onis regularly pushed back on nearly every Pride-related event or messaging. In 2023, after an event featuring an approved and well-received speaker, De Onis went on an extremely disturbing transphobic rant about how "trans women aren't real women," which made those present—especially LGBTQIA+ employees—highly uncomfortable. In April 2024, while Wright was working with other LGBTQIA+ team members, De Onis aggressively inserted herself into the planning process and cancelled an event that had already been planned—a visit from the same approved trans speaker from the year prior— causing extreme distress among the community. In early May, Wright documented these issues with De Onis in email correspondence to CEO Hall and Chief HR Officer Rogers-McCoy, who did not respond.

11. On or about April 8, 2024—approximately six weeks before Wright's termination—CEO Rich Hall ("Hall") and Chief Human Resources Officer Alison Rogers-McCoy ("Rogers-McCoy") jointly summoned and confronted Wright regarding an accusation that he had

stolen something from the CEO's office. The precise nature of the alleged wrongdoing was never clearly articulated to Wright; neither Hall nor Rogers-McCoy identified with any specificity the item purportedly taken, the basis for the accusation, or who had made it.

12. During this confrontation, Hall and Rogers-McCoy subjected Wright to aggressive, sustained questioning regarding the vague accusation. Wright offered explanations and firmly denied any wrongdoing, but Hall and Rogers-McCoy dismissed and ignored his denials and protestations throughout the encounter. The questioning was adversarial in nature, conducted by two senior executives acting in concert, and was experienced by Wright as a coordinated attack on his integrity.

13. Both Hall and Rogers-McCoy subsequently and independently acknowledged—in their own words—that the encounter constituted an "interrogation." This characterization is significant: it reflects that UTIMCO's own leadership recognized that the confrontation was not a routine inquiry or wellness check but rather a coercive and adversarial proceeding directed at an executive they had, until that moment, publicly praised as a succession candidate for the Chief Operating Officer role.

14. Following the April 8 confrontation, Hall and Rogers-McCoy directed Wright to work from home while—as subsequently became apparent—the matter was reviewed. This directive effectively removed Wright from the executive suite and his normal working environment without any formal action, accommodation, or stated timeframe.

15. UTIMCO subsequently acknowledged that Wright had done nothing wrong. Hall and Rogers-McCoy confirmed that the accusation had been unfounded and that the matter was resolved. However, neither Hall nor Rogers-McCoy apologized to Wright for the

interrogation, retracted the accusations in any formal or meaningful way, or took any steps to address the reputational and emotional harm the confrontation had caused.

16. Wright expressly communicated to both Hall and Rogers-McCoy that the April 8 interrogation had been "traumatizing" to him. This disclosure was direct and unambiguous. Hall and Rogers-McCoy therefore had actual, contemporaneous knowledge, as of April 8, 2024, that their conduct had caused Wright significant psychological harm—harm that materially worsened the anxiety and depression they were already aware he suffered from.

17. UTIMCO's response to Wright's disclosure that the interrogation had been traumatizing was inadequate. Neither Hall nor Rogers-McCoy acknowledged the impact of their conduct, initiated any follow-up with Wright, referred him to any resources, or modified their management of him in any meaningful way. The interrogation and its aftermath were simply left unaddressed.

18. Around the same time (early May), Wright experienced a number of personal issues, including the death of a family friend, exacerbating Wright's depression and anxiety and necessitating Wright to take time off work to travel for the funeral and grieve. On May 13, he attempted to return to work but Chief HR Officer Rogers-McCoy encouraged him to take additional time off work, which he did. Several days later, he had lunch with Hall and recapped the recent issues he had experienced, both in his personal and professional life, and the ways in which they had exacerbated his depression and anxiety. Hall acknowledged those issues and told Wright to "take all the time you need." On May 19, Wright texted both Hall and HR that he was taking two additional weeks off work and would be back in June. Hall acknowledged receipt, yet attempted to dissuade Wright from requesting FMLA,

insisting that he "just use PTO" instead. However, HR confirmed that this was a sufficient request for leave as an accommodation and followed up that evening with formal FMLA paperwork for Wright, indicating that the forms could be retroactive to cover the entire time Wright was out of work and could be completed when he returned

19. However, just two days after Wright's FMLA and accommodation request, on Tuesday May 21, 2024, Hall called Wright and informed him that a contractor had showed him some text messages purportedly from Wright that violated the Company's harassment policy and Wright was terminated effective immediately. Hall did not provide any details on to whom the messages were sent, when they were sent, what they contained, how they violated the harassment policy, or how UTIMCO established that Wright had in fact sent the messages in question. UTIMCO subsequently alleged over a month later, in email correspondence, that Wright was terminated following "harassment of and inappropriate behavior with a temporary contractor at UTIMCO." There had been no mention of inappropriate behavior in the phone call, nor was there any mention of text messages in the email. No details were ever provided, despite reasonable requests for clarification.

20. Following Wright's termination on May 21, 2024, UTIMCO personnel made statements to others characterizing Wright as dangerous and unstable. These characterizations were false. At the time they were made, UTIMCO had publicly praised Wright's leadership, identified him as a succession candidate for Chief Operating Officer, and—on its own acknowledgment—exonerated him in connection with the April 8 accusation. UTIMCO had no good-faith basis for characterizing Wright as dangerous or unstable.

21. Wright suffered from anxiety and depression—conditions he disclosed openly and that UTIMCO knew about throughout his tenure. To characterize an employee as "dangerous and unstable" immediately following his invocation of FMLA leave for those conditions is both false and highly injurious. Such characterizations, if made to prospective employers or professional colleagues, would tend to harm Wright's professional reputation and impede his ability to secure comparable employment—directly compounding the economic harm caused by the unlawful termination itself.

22. The post-termination characterizations of Wright as dangerous and unstable are further evidence of UTIMCO's retaliatory animus. A pattern of conduct that includes: (a) a baseless interrogation acknowledged by UTIMCO's own leadership as such; (b) termination two days after an FMLA request without any meaningful investigation; (c) shifting and inconsistent stated reasons for the termination; and (d) post-termination statements designed to damage Wright's reputation—collectively reflects an employer that was not acting in good faith but was instead engaged in a campaign of retaliation against a protected employee.

## IV.
## CAUSES OF ACTION

23. Defendant's acts and omissions have given rise to the following causes of action:

## COUNT I
## Retaliation under the Family and Medical Leave Act

24. Plaintiff incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

25. This is an action for retaliation and interference under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 et seq. Plaintiff Adam Wright, a highly accomplished executive with an unblemished record, requested FMLA leave to address serious mental health conditions—anxiety and depression—that had been exacerbated by sustained workplace hostility and personal tragedy. Just two days after he submitted his FMLA paperwork, UTIMCO terminated his employment. The stated reason— unspecified purported harassment Wright denies and that UTIMCO never meaningfully investigated—is pretextual. The true reason was retaliation for Wright's exercise of his federally protected rights.

26. The FMLA prohibits an employer from retaliating against an employee for exercising or attempting to exercise any right afforded by the Act. 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c). To establish a prima facie case of retaliation, a plaintiff must demonstrate: (1) engagement in a protected activity under the FMLA, (2) an adverse employment action, and (3) a causal connection between the two. *Waggel v. George Wash. Univ.*, 957 F.3d 1364 (2020).

27. At all relevant times, Wright was an eligible employee within the meaning of the FMLA. 29 U.S.C. § 2611(2).

28. At all relevant times, UTIMCO was a covered employer within the meaning of the FMLA. 29 U.S.C. § 2611(4).

29. Wright suffered from anxiety and depression—serious health conditions within the meaning of the FMLA. 29 U.S.C. § 2611(11); 29 C.F.R. § 825.113. Case law supports this interpretation. In, *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466 (8th Cir. 2007), the

court recognized that mental illnesses, including those requiring periodic doctor's visits to prevent episodes of incapacity, qualify as serious health conditions under the FMLA. *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466 (8th Cir. 2007).  Similarly, in, *Donovan v. Nappi Distribs.*, 703 F. Supp. 3d 135 (D. Me. 2023), the court concluded that conditions such as anxiety, panic disorder, PTSD, and major depressive disorder could meet the "serious health condition" standard when they involve ongoing treatment and periods of incapacity. *Donovan v. Nappi Distribs.*, 703 F. Supp. 3d 135 (D. Me. 2023).  Additionally, *Marrero v. Camden County Bd. of Soc. Servs.*, 164 F. Supp. 2d 455 (D.N.J. 2001) emphasized that mental illnesses, including anxiety and depression, may qualify as serious health conditions if they meet the regulatory requirements, such as incapacity and continuing treatment. *Marrero v. Camden County Bd. of Soc. Servs.*, 164 F. Supp. 2d 455 (D.N.J. 2001).

30.    Wright engaged in protected activity under the FMLA when, on or about May 19, 2024, he requested and was provided formal FMLA paperwork to take leave to address his serious health condition.

31. Wright suffered an adverse employment action: UTIMCO terminated his employment on May 21, 2024.

32. The temporal proximity between Wright's protected FMLA activity and his termination—a period of only two days—is, standing alone, sufficient to establish the causation element of his prima facie case. Courts have consistently recognized that temporal proximity between the protected activity and the adverse action can serve as evidence of causation. However, the sufficiency of temporal proximity depends on the closeness in time between

the two events. For example, the U.S. Supreme Court has held that temporal proximity must be "very close" to establish causation. *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268 (2001).

33. UTIMCO's verbal stated reason for Wright's termination—harassment of a contractor via text messages—is a pretext for retaliation. Among other things: (a) Wright denies sending any such messages or harassing anyone; (b) UTIMCO received the alleged messages only one day before terminating Wright and conducted no meaningful investigation; (c) UTIMCO did not provide the alleged messages to Wright or allow him to respond; (d) UTIMCO did not verify that Wright had in fact authored the messages; (e) subsequently changed its stated reason to unspecified "inappropriate behavior;" and (f) UTIMCO's precipitous action is irreconcilable with its own prior laudatory assessment of Wright's performance and character.

34. UTIMCO's retaliatory termination of Wright's employment constitutes a willful violation of the FMLA. UTIMCO knew, or showed reckless disregard for whether, its conduct in terminating Wright two days after his FMLA request violated the Act.

35. As a direct and proximate result of UTIMCO's unlawful retaliation, Wright has suffered and continues to suffer damages including, but not limited to, lost wages, lost benefits, and lost future earning capacity.

## COUNT II
### Interference under the Family and Medical Leave Act

36. Plaintiff incorporates by reference all of the preceding paragraphs in this Complaint as if fully set forth herein.

37. The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempted exercise of any right provided by the Act. 29 U.S.C. § 2615(a)(1). Any violation of the FMLA or its regulations constitutes interference with an employee's rights under the Act. 29 C.F.R. § 825.220(b).

38. Wright was entitled to take up to twelve weeks of unpaid, job-protected leave during a twelve-month period to address his serious health condition. 29 U.S.C. § 2612(a)(1)(D).

39. Wright requested and was provided FMLA leave paperwork by UTIMCO on May 19, 2024, including retroactive coverage for the period he had already been away from work.

40. UTIMCO interfered with Wright's right to take FMLA leave and to be restored to his position at the conclusion of that leave by terminating his employment just two days into his approved leave period, before he had the opportunity to complete his protected leave.

41. UTIMCO's stated justification for the termination does not insulate it from liability for interference. UTIMCO's purported reason is unsupported by any meaningful investigation, and Wright denies the underlying factual premises entirely.

42. As a direct and proximate result of UTIMCO's unlawful interference, Wright has suffered damages including, but not limited to, lost wages and lost benefits.

## V.
## DAMAGES

43. Wright was a high-wage earner, with a $215,000 base salary and up to a 1.75 bonus multiplier, totaling a potential annual compensation of $591,250, which he will now have to replace along with the value of his benefits. While Wright has begun and will continue to diligently seek alternative employment, it may take him some time to secure a

comparable position and he anticipates accruing significant lost wage damages. Further, Wright was rejected from a position in June 2025 because of UTIMCO's stated reasons for termination, despite lack of any substantiating evidence.

44.    As a direct and proximate result of UTIMCO's violations of the FMLA, Plaintiff Adam Wright has suffered actual damages including:

   a.    Lost wages and salary from the date of termination forward;

   b.    Lost employment benefits, including but not limited to health, life, and retirement benefits;

   c.    Lost future earning capacity;

   d.    Interest on lost wages and benefits as provided by law; and

   e.    Such other economic losses as may be proven at trial.

45.    Plaintiff seeks monetary damages in excess of $1,000,000.00 USD, excluding attorneys' fees, costs, and interest. Plaintiff's damages include but are not limited to:

   a.    **Lost Wages.** Unpaid yearly salary of at least $215,000 per year, +1.75% bonus, plus 30% benefits ($64,500), totaling $655,750 per year, for at least two (2) years, totaling $1,311,500.00;

   b.    **Lost future earning capacity;**

   c.    Interest on all unpaid sums;

   d.    Exemplary damages for Defendants' willful and malicious conduct; and

e.      All such other damages as may be proved at trial.

46.    Because UTIMCO's violation of the FMLA was willful, Plaintiff is entitled to liquidated damages equal to the sum of the actual damages and interest described above. 29 U.S.C. § 2617(a)(1)(A)(iii).

47.    Plaintiff is entitled to equitable relief including, but not limited to, reinstatement to his former position or, in the alternative, front pay in lieu of reinstatement. 29 U.S.C. § 2617(a)(1)(B).

## VI.
## ATTORNEYS 'FEES

48.    Plaintiff is entitled to recover his reasonable attorneys' fees, expert fees, and costs of suit as provided by the FMLA. 29 U.S.C. § 2617(a)(3).

## VII.
## JURY DEMAND

49.    Pursuant to Federal Rule of Civil Procedure 38, Plaintiff Adam Wright demands a trial by jury on all issues so triable.

## VIII.
## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Adam Wright respectfully requests that the Defendant herein be cited to appear and answer, and that upon final trial hereof, Plaintiff be awarded the following:

a.      Enter judgment in Plaintiff's favor on all counts;

b.      Award Plaintiff actual damages, including lost wages and benefits;

c.    Award Plaintiff liquidated damages equal to the sum of his actual damages and prejudgment interest, pursuant to 29 U.S.C. § 2617(a)(1)(A)(iii);

d.    Order reinstatement of Plaintiff to his former position, or in the alternative, award front pay;

e.    Award Plaintiff his reasonable attorneys' fees, expert fees, and costs of suit;

f.    Award Plaintiff prejudgment and post-judgment interest at the applicable legal rate; and

g.    Grant such other and further relief as the Court deems just and proper.

Dated: May 19, 2026

Respectfully submitted,

GAUNTT, KOEN, BINNEY & KIDD, LLP

By: /s/ *Camden B. Chancellor*
State Bar No. 24082800
25700 Interstate 45 North, Suite 130
Spring, Texas 77386

Telephone: 281-367-6555
Facsimile: 281-367-3705
Email:  camden.chancellor@gkbklaw.com
*Counsel for Plaintiff, Adam Wright*